# No. 25-40230

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

Omar Cano-Lopez,

Plaintiff – Appellant,

v.

Kristi Noem, Secretary, U.S. Department of Homeland Security,

Defendant – Appellee.

---

## On Appeal from
United States District Court for the Southern District of Texas

1:23-CV-44

---

## BRIEF OF APPELLANT OMAR CANO-LOPEZ

SUBMITTED BY:

Jaime M. Diez
Jones & Crane
P.O. Box 3070
Brownsville, TX 78523

Telephone: (956) 544-3565
Fax: (956) 550-0006

Texas State Bar Number 00783966

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| Kristi Noem, Secretary, U.S. Department of Homeland Security | Brendan Moore of U.S. Department of Justice Washington, DC |

| Appellants: | Counsel for Appellants: |
| --- | --- |
| Omar Cano-Lopez | Jaime Diez of Jones & Crane Brownsville, TX |

S/Jaime M. Diez
Attorney of record for Omar Cano-Lopez

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Omar Cano-Lopez respectfully requests oral argument as he believes it could significantly aid the decisional process in this case.

# TABLE OF CONTENTS

Contents                                                                 Page(s)

CERTIFICATE OF INTERESTED PERSONS ...................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iv

TABLE OF CONTENTS............................................................................................v

TABLE OF AUTHORITIES ................................................................................... vi

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT OF THE ISSUES.................................................................................2

STATEMENT OF THE CASE......................................................................................2

SUMMARY OF THE ARGUMENT ........................................................................10

ARGUMENT ...........................................................................................................11

CONCLUSION .........................................................................................................21

CERTIFICATE OF SERVICE ........................................................................... - 22 -

CERTIFICATE OF COMPLIANCE.................................................................. - 23 -

# TABLE OF AUTHORITIES

*Cano-Lopez v. Bondi*, No. 22-60605 (filed Nov. 10, 2022) ........................... 3

*Cano-Lopez v. Mayorkas*, No. 1:23-CV-00044, 2024 WL 4101807 (S.D. Tex. July 10, 2024)................................................................................................. 5

*Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993) ....... 20

*Garza-Flores v. Mayorkas*, 38 F.4th 440 (5th Cir. 2022)............................. 10, 15

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ............................. 11

*Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688 (5th Cir. 2003) ............... 17

*Klick v. Cenikor Found.*, 509 F. Supp. 3d 951 (S.D. Tex. 2020) ................... 19

*Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595 (5th Cir. 2000) ....... 11

*Martinez v. Blinken*, No. 1:18-CV-092, 2023 WL 3452063 (S.D. Tex. May 15, 2023) ......................................................................................................... 11, 12

*Reyes v. Neely*, 264 F.2d 673 (5th Cir. 1959) .............................................. 11

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017) ...................................... 3

*Small v. Hunt*, 98 F.3d 789 (4th Cir. 1996) .................................................. 20

*Soloe v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 869 F.2d 493, 1989 WL 20563 at *4 (6th Cir. 1989) .................................................. 19

*Templet v. HydroChem Inc.*, 367 F.3d 473 (5th Cir. 2004)........................... 16

*United States v. Garza-Flores*, No. 2:20-CR-00953, 2021 WL 5771866 (S.D. Tex. Dec. 5, 2021)...................................................................................... 11


8 U.S.C. § 1252(b)(4)(B)(4) ........................................................................ 3

8 U.S.C. § 1401(a)(7) (1952) ....................................................................... 2


Federal Rule of Civil Procedure 59 .......................................................... 9, 10

Federal Rule of Evidence 201(b)(1) ......................................................... 6, 15

Federal Rule of Evidence 201(c)(1)........................................................... 6, 15

Federal Rule of Evidence 804(a)(4)........................................................... 20

Federal Rule of Evidence 803(19) ............................................................ 20

Federal Rule of Evidence 804(b)(4)(B) ..................................................... 20


8 Foreign Affairs Manual 301.7-3 ............................................................. 11

# JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292 because it is an appeal of orders[1] denying Appellant's claim of acquired citizenship pursuant to 8 U.S.C. § 1401(a)(7) (1952).

Appellant timely appealed by filing his notice of appeal[2] within 30 days of the district court's order of April 10, 2025.

---

[1] ROA.527-30, 620-21.

[2] ROA.626.

# STATEMENT OF THE ISSUES

1) Did the district court err in determining that Appellant had not met his burden of showing 10 years of physical presence in the United States by his father before Appellant's birth?

2) Did the district court err in denying Appellant's post-trial Rule 59 motion, thereby excluding significant first-hand evidence of his father's physical presence in the United States?

# STATEMENT OF THE CASE

Appellant Omar Cano-Lopez (Mr. Cano) presented extensive documentation and testimony at a bench trial to determine whether he acquired U.S. citizenship from his father Leonel when Mr. Cano was born in September 1963. The applicable immigration provision, 8 U.S.C. § 1401(a)(7) (1952),[3] required 10 years of physical presence by Leonel prior to his child's birth, at least five of which were after Leonel

---

[3] The statutory language confers citizenship on "a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years."

turned 14 in 1947.[4]  As Leonel was born in August 1933, his whereabouts during the three subsequent decades preceding Mr. Cano's birth are this case's focus.

Mr. Cano currently faces both criminal (S.D. Tex. Case No. 1:22-CR-00993) and civil immigration charges, the outcomes of which depend on his citizenship. The civil proceedings are based on the Department of Homeland Security's October 14, 2022, reinstatement of a 1997 deportation order issued to Mr. Cano after he became a lawful permanent resident in 1982 and was subsequently convicted of a deportable offense. ROA.14, 37, 254-55.  Mr. Cano petitioned this Court for review of the reinstated order, a case which is awaiting resolution of the instant appeal. *See Cano-Lopez v. Bondi*, No. 22-60605 (filed Nov. 10, 2022).  In response to Mr. Cano's unopposed motion to transfer his petition to district court based on material issues of fact pertinent to his nationality, *see* 8 U.S.C. § 1252(b)(4)(B)(4), this Court entered a transfer order on March 6, 2023. ROA.11.

Mr. Cano supported his citizenship claim in district court, emphasizing an affidavit from his mother Oralia, who Leonel predeceased. ROA.323.  This affidavit dated December 28, 2022, details Oralia meeting Leonel in 1948 and their marriage four years later in 1952. ROA.323.  Oralia stated:

---

[4] "Congress has since reduced the duration requirement to five years, two after age 14." *Sessions v. Morales-Santana*, 582 U.S. 47, 53 (2017).

> When I met my husband, he would come to the U.S. I remember that he used to sell newspapers in Brownsville. And then after we married, he continued to work in the U.S. He always lived and worked in the U.S. And he would come only . . . whenever he could to see us and the children in Matamoros where we lived. He would leave us money and would return to work to the U.S. I know he worked in Brownsville, Chicago, Houston and other places. My husband never worked in Mexico.

ROA.324.

Mr. Cano also referred to a 1979 Consulate Memorandum from the U.S. Consulate in Matamoros, Mexico, addressing Leonel's physical presence. That memorandum addressed Mr. Cano's citizenship, noting Leonel's 1955 U.S. birth certificate. ROA.304, 319 (birth certificate). It considered the contents of an affidavit by Oralia to assume that Leonel "had two full years in the U.S. as a child, and that he resided in the U.S. from the day he obtained his delayed birth certificate until the present [to conclude that] he still falls short of the required ten years." ROA.304. The memorandum reasoned that Leonel "allegedly established residence on 11/2/55 [the date of his birth certificate]; Cano was born in September 1963. Therefore he falls short by one month and 8 days." ROA.304.

Appellee responded to Mr. Cano's claim in district court by filing a motion for summary judgment, ROA.253. The motion appended exhibits from the family's immigration records, including an affidavit submitted by Leonel in 1973 regarding his children's applications for certificates of citizenship. Leonel there states that:

"As best I can remember, I live or was in the U.S. from birth until age 2 or 3 years. . . . I did not return to the U.S. until sometime in September of 1956 and since that time I have been in the U.S. with the exception of short visits to Mexico to visit my family." ROA.350. Leonel added that "[f]rom 1956 to 1969 I went to work all the way to Chicago. During those years I would spend from 7 to 8 months in Chicago, the rest of the time I would live in Matamoros . . . but would commute daily to Brownsville, Texas to work. . . . Also in 1959, I spent about 6 months in Mexico while ill and recovering." ROA.350.

The district court denied summary judgment on July 10, 2024. ROA.421; *Cano-Lopez v. Mayorkas*, No. 1:23-CV-00044, 2024 WL 4101807 (S.D. Tex. July 10, 2024). The court explained that: "Petitioner presents the testimony of his mother and siblings which bolsters—rather than detracts from—Petitioner's citizenship claim when viewed 'in the light most favorable to [Petitioner as] the opposing party.' Testimony elicited from Petitioner's mother affidavit suggests that Petitioner's father may have accrued a large amount of physical presence time in the United States even before he officially moved to the country in 1956." ROA.423; *Cano-Lopez*, 2024 WL 4101807, at *2 (footnote and citations omitted). Further, the court cautioned that while, "[a]dmittedly, some witness testimony may seem vague when isolated. . . . Petitioner brings sufficient evidence—when viewed as a whole—indicating that his father lived in Matamoros, Tamaulipas, Mexico and 'always

5

worked in the United States' since Petitioner's father was at least fifteen years old." ROA.423. Importantly, the court took judicial notice "that Matamoros adjoins Brownsville, TX along the United States border. Because of this, the Courts finds it likely—given the time frame and customs practiced then—that individuals living in Matamoros, like Petitioner's father, often entered the United States for work." *Id*. at *2 n.4 (citing Federal Rules of Evidence 201(b)(1) & 201(c)(1)).

At trial on September 23, 2024, Mr. Cano presented two of his siblings as witnesses. His sister Maria, who was born in 1965, ROA.648, testified about Leonel that when she was a child "I hardly saw him, I would hardly see him when he would come and visit." ROA.633; *see also* ROA.655-56 (district court clarifying with Maria her understanding that Leonel was in the U.S. from about the age of 14 "[a]lmost all the time. He would hardly come to Matamoros."). Maria noted that she had obtained a certificate of citizenship through Leonel, ROA.635, 654-55 (no other sibling obtained citizenship), and noted of her father that "according to what I heard . . . he was very young when he came to work here in the United States." ROA.640-41; *see also* ROA.654 (specifying her mother and grandmother as family members who had shared information with Maria about Leonel). Maria specified Leonel's age when "very young" to be 14 years old, ROA.641, as well as identifying Chicago and Houston as cities where Leonel worked. ROA.641.

Maria recognized a photograph dated October 1956 as portraying Leonel in Chicago. ROA.641-42.  She noted that "all his work history was not with companies, he was working, like, in person, with other persons." ROA. 644; *see also* ROA.653-54 ("[H]e was working cutting trees, he was working on his own, working for houses, working out on the streets.").

Mr. Cano's second witness was his brother Oscar, who was born in September 1953. ROA.658.  Oscar testified that Leonel "left to Mexico when he was five years old and then he came back.  He was around 14 years old when he came here and he was crossing all the time." ROA.659.  Oscar identified "J&O clothing" as Leonel's employer in Brownsville before he went to work in Chicago and then Houston. ROA.660-61.  Asked whether "your father always worked in the United States as far as you know . . . [a]nd that he began working sometime when he was 14 or 15," Oscar answered in the affirmative. ROA.670-71.  Oscar estimated that his father would visit Matamoros "every three or four months . . . [and] stay maybe like three or four days and maybe sometimes a week." ROA.672-73.

A final witness, Magdalena Lopez, who was married to Oralia's brother, also testified.  She noted that when she met Oralia, in 1952 or 1955, Leonel was already working in Chicago. ROA.678.

The district court concluded on January 16, 2025, that Mr. Cano had not met his burden of proof. The court found that Leonel was born in Brownsville, Texas, and lived in the U.S. "until he was around one to three years old," when Leonel moved to Mexico. ROA.527. Subsequently, "[b]y the age of 15, Leonel began working in Brownsville. . . . From the age of 15 onward [1948 and after], Leonel worked various jobs within the United States, but it is unclear where and when these jobs took place." *Id*. The court noted that Mr. Cano's "witnesses all testified that Leonel was rarely at home to raise or watch the children throughout their upbringing. Petitioner's brother, who is ten years older, testified to Leonel's (lack of) presence at home. *See also* Pet. EX 6 (affidavit where Petitioner's mother Oralia testifies similarly.)" ROA.528 & n.4. Yet, the court considered itself "unable to discern a clear amount of time that Leonel was in the United States." ROA.528.

Without estimating a ratio of Leonel's time spent in each country, the district court concluded that Mr. Cano "failed to provide clear, strong evidence supporting the inference that his father met the physical presence requirement. The testimony at trial was limited, vague, and scattered. The Court is sympathetic to the fact that Petitioner's witnesses are testifying to events which took place nearly seventy years ago, but the burden of proof remains on Petitioner to provide sufficient evidence and testimony to support his claim for citizenship." ROA.529.

Mr. Cano filed a Federal Rule of Civil Procedure 59 motion for new trial, or to alter or amend the judgment. ROA.570. The motion was based on "pivotal testimony from María Luisa Sáenz, age 89, who is Plaintiff's aunt and Leonel's sister-in law as the widow of his only (older) brother, Santos Sáenz. Last fall, at the time of trial, Mrs. Sáenz['s] health was too compromised, due primarily to heart problems, for her to provide testimony or for counsel to subpoena her." ROA.571. In support of the motion, Mrs. Sáenz provided an affidavit concerning Leonel's presence in the United States. ROA.581.

On April 10, 2025, the district court denied Mr. Cano's Rule 59 motion, stating that he "failed to inform his attorney or Defendant of Ms. Sáenz; there is no evidence Plaintiff monitored her health, moved to stay proceedings for the sake of her testimony, or tried to enter this evidence without exposing Ms. Sáenz to the pressures of litigation." ROA.621. This appeal timely followed.

## SUMMARY OF THE ARGUMENT

This Court has recognized that in citizenship cases based on events in the distant past, "it may prove difficult to establish such obsolete facts as where your parents lived many years ago, and exactly how long they lived there. A factfinder may have to sift through whatever personal documentation remains available and determine what inferences may be drawn accordingly." *Garza-Flores v. Mayorkas*, 38 F.4th 440, 443 (5th Cir. 2022). Here, the district court failed to engage in such sifting, which would have resulted in a determination that Mr. Cano satisfied his preponderance-of-the-evidence burden to demonstrate he acquired U.S. citizenship through his father Leonel's requisite physical presence in this country during the period from 1933 to 1963.

After mistakenly ruling against Mr. Cano, the district court compounded its error by denying his Rule 59 motion that sought to bring an elderly witness's unique evidence before the court. The witness had previously been too unwell to participate in Mr. Cano's proceedings, but in the motion provided non-cumulative and potentially outcome-changing evidence of Leonel's pertinent physical presence in the U.S.

# ARGUMENT

This Court reviews the district court's findings of fact for clear error and legal issues de novo. *See Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000). Mr. Cano bore the burden of proving Leonel's physical presence by a preponderance of the evidence. *Reyes v. Neely*, 264 F.2d 673, 678 (5th Cir. 1959). To prove a fact under this standard, Mr. Cano must show that the existence of said fact is more likely than not. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983).

I. **The district court erred in determining that Mr. Cano had not met his burden of showing 10 years of physical presence in the United States by Leonel before Mr. Cano's birth.**

Physical presence is distinct from residence. The State Department's Foreign Affairs Manual explains that the Immigration and Nationality Act "does not define 'physical presence,' but the Department interprets it as actual bodily presence. Any time spent in the United States or its outlying possessions, even without maintaining a U.S. residence, may be counted toward the required physical presence." 8 FAM 301.7-3. At issue in this case, the 10-year "requirement can be met through the cumulation of non-continuous periods of time within the United States." *Martinez v. Blinken*, No. 1:18-CV-092, 2023 WL 3452063, at *4 (S.D. Tex. May 15, 2023); *see also United States v. Garza-Flores*, No. 2:20-CR-00953,

11

2021 WL 5771866, at *6 (S.D. Tex. Dec. 5, 2021) ("An individual does not need to be physically present in the United States continuously.").  Physical presence and residence are often confused; indeed, in this record the Matamoros consulate's rejection of Mr. Cano's citizenship in 1979 erroneously stated that if Leonel "allegedly established [U.S.] *residence* on 11/2/55 [the date of his delayed birth certificate] . . . he falls short by one month and 8 days." ROA.304.  Leonel's affidavit statement in 1973 that "I did not return to the U.S. until sometime in September of 1956," ROA.350, also refers to residence rather than physical presence.

The distance between the two sides' positions on Leonel's physical presence boils down to two principal disagreements: (1) how much time he spent in the United States from age 15 to 23, covering the years 1948 to 1956; and (2) how much time from 1956 to 1963 he spent in Mexico while working in the United States.  The district court chose not to engage on the details of these time periods; Mr. Cano contends that if it had his burden of showing Leonel's 10 years would clearly have been met. *Compare Martinez*, 2023 WL 3452063, at *5 (calculating despite "conflicting evidence" that "it is more likely than not that Jorge traveled to Mexico on average once every three months, staying for an average of one week on each occasion.  This finding leads the Court to conclude that during this time period, Jorge spent 84 days per annual quarter in the United States" and that "it is

more likely than not that during … four years of education, Jorge spent 35% of his time on property considered to be within the United States").

The district court found that Leonel was in the United States "until he was around one to three years old," when he moved to Mexico. ROA.527.  Appellee submitted a "departure card" for "Saenz Leonel" dated December 6, 1934. ROA.351.  Although this card records an incorrect birthdate for Leonel of November 4, 1932, ROA.351, if it is accurate then Leonel was in the U.S. for **16 months** after he was born.

Leonel's return to reside in the United States in September 1956, as recorded in his own affidavit, ROA.350, appears uncontested, as does his greater than five years of physical presence from 1956 to 1963 when Mr. Cano was born.  Leonel's affidavit acknowledges that he spent six months of 1959 in Mexico, ROA.350, but during this seven-year period he was mainly in Chicago, and otherwise splitting time between Matamoros and Brownsville: "During those years I would spend from 7 to 8 months in Chicago, the rest of the time I would live in Matamoros . . . but would commute daily to Brownsville, Texas to work." ROA.350.  Assuming an average of 7.5 months a year in Chicago for six years, except for 1959 when the implication is that Leonel spent only 6 months there, the sum is **51 months** (45 +6).

Appellee stops there, contending that "[d]uring those seven years, Leonel Cano spent at least four months each year back in Mexico." ROA.272. But that assertion is flatly contradicted by Leonel's affidavit stating he "would commute daily to Brownsville, Texas to work" when he was residing in Matamoros. Assuming 4.5 months in Mexico each year except for 1959, that amounts to 27 months, at least 50% of which or **13.5 months** should be assumed to be in Brownsville.

The bookends of (a) Leonel's time in the U.S. as a baby from 1933 to at least 1934 when he moved to Mexico; and (b) his work years in Chicago from 1956 to 1963 surround the period 1948 to 1956, eight years when Leonel was not residing in the U.S. but was regularly working there by all accounts in the record, such as his wife Oralia's affidavit. ROA.324 ("When I met my husband [in 1948], he would come to the U.S. I remember that he used to sell newspapers in Brownsville. And then after we married, he continued to work in the U.S."). Oscar Cano identified a specific Brownsville business that Leonel worked for, the J&O clothing store. ROA.660-61. Based on these submissions, the district court found that "[b]y the age of 15, Leonel began working in Brownsville. . . . From the age of 15 onward [1948 and after], Leonel worked various jobs within the United States . . . ." ROA.527. Indeed, the court had taken judicial notice "that Matamoros adjoins Brownsville, TX along the United States border. Because of

14

this, the Courts finds it likely—given the time frame and customs practiced then—that individuals living in Matamoros, like Petitioner's father, often entered the United States for work." *Id*. at *2 n.4 (citing Federal Rules of Evidence 201(b)(1) & 201(c)(1)).

In this context, it was clear error for the district court to then find that a preponderance of the evidence did not support Leonel's work and presence in Brownsville from 1948 to 1956 and then in Chicago from 1956 to 1963. ROA.527 ("it is unclear where and when these jobs took place"). If the district court had applied a 50% estimate to Leonel's divided life during the Matamoros-Brownsville period of 1948 to 1956, that would have added **48 months** to his physical presence, making the total **128.5 months** to satisfy the 10-year physical-presence requirement.

As did this Court in *Garza-Flores*, 38 F.4th 440, Mr. Cano understands that the passage of time has muddied memories and made Leonel's physical presence more challenging to discern. Applying preponderance of the evidence, however, the district court should have pieced together the manifold consistent through-lines in Mr. Cano's evidence, documentary and testimonial. The court failed to mention the important objective inferences to be drawn from official records of the Cano family's immigration history. The Matamoros consulate's 1979 conclusion that Mr. Cano "falls short by one month and 8 days," ROA.304, undercounts his

presence because it assumed Leonel did not enter the U.S. from 1935 to 1955 (and also overcounts his presence from 1956 on). Yet, it is strong support for Leonel's own 1973 affidavit and his family members' corroboration of the time periods and cities in which he worked.

The district court clearly erred in not "sifting" through the historical evidence, which supports the overarching narrative of Leonel's 10-year physical presence. This Court should therefore hold that Mr. Cano satisfied his burden of demonstrating U.S. citizenship.

## II. The district court erred in denying Mr. Cano's Rule 59 motion, thereby excluding significant first-hand evidence of his father's physical presence in the United States.

This Court reviews the district court's denial of Mr. Cano's Rule 59 motion for abuse of discretion. *Templet v. HydroChem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004). The motion was based on "pivotal testimony from María Luisa Sáenz, age 89, who is Plaintiff's aunt and Leonel's sister-in law as the widow of his only (older) brother, Santos Sáenz. Last fall, at the time of trial, Mrs. Sáenz['s] health was too compromised, due primarily to heart problems, for her to provide testimony or for counsel to subpoena her." ROA.571. In support of the motion, Mrs. Sáenz provided an affidavit concerning Leonel's presence in the United States. ROA.581.

As explained by Mrs. Sáenz's daughter, Irma Sáenz Lozano, in another affidavit attached to the motion: "She has a p[]ace maker. She suffers from high blood pressure, beginning of pneumonia, problems with her knees that don't allow her to be [o]n her feet, and other problems of age." ROA.579. Mrs. Sáenz's condition had improved; her daughter verified that Mrs. Sáenz is "doing better." ROA.579.

Mrs. Saenz's belated affidavit contains important information reinforcing Leonel's physical presence working in the U.S., although it misstates the location to be Houston rather than Chicago during the relevant period. She attests:

> I met my husband Santos when I was 15 or 16 years old. I met Leonel around the same time I met my husband. So, I met Leonel Cano when I was approximately 15 or 16 years old in Matamoros. Leonel Cano, was my brother-in-law—I was married to Leonel's older brother. His name was Santos Saenz. . . . Since I met Leonel [in 1950 or 1951, when Leonel was 17 or 18 years old], I know he was working in Houston, Texas. . . . I know Leonel would come to see his family whenever he could. However, it was not very often because he worked in Houston, which is not close to Matamoros. . . . I remember [h]e would come for the weekend, sometimes for Christmas and would go back to work to Houston, Texas.

ROA.581-82.

The district court abused its discretion in denying Mr. Cano's Rule 59 motion because "(1) the facts discovered are of such a nature that they would probably change the outcome; (2) the facts alleged are actually newly discovered and could not have been discovered earlier by proper diligence; and (3) the facts are not merely

cumulative or impeaching." *Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688, 696-97 (5th Cir. 2003).  None of the trial witnesses had been Leonel's contemporaries from before he met his wife, so Mrs. Sáenz's perspective is unique.  Her evidence is particularly well-suited to establishing Leonel's U.S. presence, because Mrs. Sáenz met him a year or two earlier than his marriage.  Mrs. Sáenz explains in her affidavit:

> I know about Leonel's life because after I got married to Santos, I lived in the same neighborhood in Matamoros that Leonel Cano's wife (Oralia Cano) and his mother (Josefina Cano) lived. Oralia (my sister-in-law) and Josefina (my mother-in-law) lived in one house together and I lived in another house a block away. So back then I would see Leonel pretty much every time he came to Matamoros to visit his family. When he visited his family, he would also visit[] his brother. My husband.

> That is why I know that since I met Leonel [in 1950 or 1951], he worked in Houston. I know Leonel would come to see his family whenever he could. However, it was not very often because he worked in Houston, which is not close to Matamoros. Sometimes he would come to Matamoros after two weeks, other times he would come once a month or more months would go by. I remember [h]e would come for the weekend, sometimes for Christmas and would go back to work to Houston, Texas.

> Both [m]y husband Santos, and my brother-in-law Leonel were always working. Back then they had to[]. I had 10 children. And Leonel's wife had 7. And that is why Leonel, and my husband Santos always worked in Texas. They had a big family to support.

ROA.581-82.

Mrs. Sáenz's affidavit is not cumulative of evidence at trial, because she knew Leonel before anyone who provided testimony.  Although Appellant's position is that he provided enough evidence at trial to meet his burden, Mrs. Sáenz's evidence

could "change the outcome" by making more-likely-than-not Leonel's required 10-year presence. If Mrs. Sáenz met Leonel in 1951, the later of the two-year-period she recalls, her affidavit testimony about his continuous work in the U.S. and only brief visits to his family spans 12 years before Mr. Cano was born.

The district court faulted Mr. Cano for not bringing Mrs. Saenz's circumstances to the attention of his attorney and the court. While ideally that would have happened, reasonable diligence is a fact-specific inquiry. *See Soloe v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab*., 869 F.2d 1493, 1989 WL 20563 at *4 (6th Cir. 1989) (noting, in a case where client did not inform counsel of pertinent information, that a relevant factor is whether the client "failed to exchange the evidence because of some extenuating circumstance"). As Mr. Cano explained in an affidavit included with his motion, "[w]hen we were preparing for trial I did not provide my attorney the name of my aunt . . . because my daughter . . . told me that my cousin Letty told her that my aunt . . . was not available to testify because she had medical problems. And they didn't want to expose her to the pressure of being [in] court." ROA.578.

Analogizing to equitable tolling, here Mr. Cano has demonstrated "reasonable diligence, not maximum feasible diligence, and an extraordinary circumstance that derives from some external obstacle to timely filing . . . . beyond the plaintiff's control, not from self-inflicted delay." *Klick v. Cenikor Found.*, 509 F. Supp. 3d 951,

955 (S.D. Tex. 2020) (quotation marks and citation omitted). Mr. Cano was properly diligent; however, Mrs. Sáenz's health unfortunately did not cooperate, a "legitimate justification for not presenting the evidence during the earlier proceeding." *Small v. Hunt*, 98 F.3d 789, 798 (4th Cir. 1996) (quotation marks and citation omitted). Federal Rule of Evidence 804(a)(4) specifically recognizes situations, as here with Mrs. Sáenz, in which declarants "cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness." Mr. Cano's family, as established in his affidavit, was afraid of the impact on Mrs. Sáenz's health of participating in the proceedings.

For post-trial motions, a district court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). A just decision in Plaintiff's case cannot be rendered without considering Mrs. Sáenz's first-hand, vital evidence of Leonel's continuous physical presence in the U.S.; indeed, the Federal Rules of Evidence extend special solicitude to "a person's family by blood, adoption, or marriage . . . [about central] facts of personal or family history." Fed. R. Evid. 803(19), 804(b)(4)(B). Mrs. Sáenz's affidavit is central to establishing "all the facts" in deciding Plaintiff's citizenship; the Court should therefore grant this motion because her evidence is colorably outcome-determinative.

# CONCLUSION

For the foregoing reasons, Mr. Cano respectfully requests that the Court reverse the district court's determination that he failed to meet his burden of proving U.S. citizenship through his father's sufficient physical presence.

DATED: August 15, 2025.

Respectfully submitted:

<u>S/Jaime M. Diez</u>

Jones & Crane
P.O. Box 3070
Brownsville, TX 78523
Telephone: (956) 544-3565
Fax: (956) 550-0006

Texas State Bar Number 00783966

# CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on August 15, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

S/Jaime M. Diez

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(7)(B) because, excluding the parts of the document exempted by F<small>ED</small>. R. A<small>PP</small>. P. 32(f) and 5th C<small>IR</small>. R. 32.1:  this document contains 4,687 words.

2.  This document complies with the typeface requirements of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(5), and 5th C<small>IR</small>. R. 32.1 and the type-style requirements of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 font.

S/Jaime M. Diez